## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| ADONIS I. GOINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 12-1153-SLR |
| | ) |
| CAROLYN W. COLVIN, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

---

Gary W. Lipkin, Esquire, of Duane Morris LLP, Wilmington, Delaware. Counsel for Plaintiff.

Charles M. Oberly III, Esquire, United States Attorney, District of Delaware, and Dina White Griffin, Esquire, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia Pennsylvania. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, Region III and Katie M. Gaughan, Esquire, Assistant Regional Counsel, Office of General Counsel, Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant.

---

## MEMORANDUM OPINION

Dated: August 13, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Adonis I. Goins ("plaintiff") appeals from a decision of Carolyn W. Colvin, the Commissioner of Social Security ("defendant"),[1] denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. (D.I. 1) Plaintiff has filed a motion for summary judgment asking the court to award DIB or remand for further proceedings. (D.I. 10,11) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm her decision and enter judgment in her favor. (D.I. 13, 14) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[2]

## II. BACKGROUND

### A. Procedural History

Plaintiff filed a protective claim for DIB on April 26, 2007, asserting disability (since the alleged onset date of October 15, 2006) due to back problems, migraines, sinusitis, depression and post-traumatic stress disorder ("PTSD"). (D.I. 8 at 233-36,

---

[1]Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013, after this proceeding was initially filed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin replaced the previous Commissioner, Michael J. Astrue, as the defendant in this case.

[2]Under § 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

282) His claim was denied initially and after reconsideration. (Id. at 100-104, 108-113) Administrative Law Judge Melvin D. Benitz ("ALJ") held a hearing on May 21, 2009. (Id. at 60-82) In a decision dated August 3, 2009, the ALJ found plaintiff not disabled. (Id. 85-95) On August 17, 2009, plaintiff requested a review of the ALJ's decision by the Appeals Council. (Id. at 146-47)

On April 14, 2010, the Appeals Council remanded the matter, finding, in part, that the ALJ failed to provide an adequate evaluation of the medical source opinion evidence offered by Cyndia Choi, M.D. ("Dr. Choi"), plaintiff's treating psychiatrist. (Id. at 98) The Appeals Council directed the ALJ to consider the detailed medical opinions offered by Dr. Choi and to assess this information against pertinent Social Security Rulings. (Id. at 98-99)

A hearing was held before the ALJ on January 4, 2011. (Id. at 30-59) Plaintiff, represented by counsel, appeared and testified. (Id. at 11) Vocational expert, Mitchell A. Schmidt ("VE"), also testified.

In a decision dated February 4, 2011, the ALJ found that plaintiff was not disabled. (Id. at 8-29) The Appeals Council denied review. (Id. at 1-6) Having exhausted his administrative remedies, plaintiff filed a civil action on May 5, 2012, seeking review of the final decision. (D.I. 1)

## B. Factual Background

### 1. Plaintiff's medical history, treatment and condition.

Plaintiff, born in 1970, was 36 years old at his alleged onset date. (D.I. 8 at 33, 233) Plaintiff is considered a younger individual under 20 C.F.R. 404.1563(c). He has a

2

high school education and a vocational degree in pharmaceuticals. (*Id.* at 33) Plaintiff's past relevant work was as a building maintenance manager, an air line baggage handler, park service worker, construction worker, and a dialysis technician. (*Id.* at 53-54)

The record medical evidence reflects that in December 1998, plaintiff commenced treatment in the emergency room at the Philadelphia Veterans Affairs Medical Center ("VAMC"), after having sustained an injury while lifting a heavy box.[3] (*Id.* at 443) Medical notes indicate that, due to a car accident in 1993, plaintiff suffered chronic low back pain, whiplash and neck pain. (*Id.* at 443) As a result of the injury, he had increased pain in his back and neck. X-rays were negative. Plaintiff was advised to rest, avoid heavy lifting, and to use a heating pad. A follow-up appointment with the VAMC clinic was scheduled. (*Id.*)

On February 21, 2002, plaintiff went to the Primary Care Center at the VAMC for his first appointment. (*Id.* at 440) He was treated by Joan A. Gallo, CRNP ("Nurse Gallo"). (*Id.* at 441) Medical notes identify low back pain and migraines as his chief problems. (*Id.* at 440) X-rays, anti-inflammatory medications and physical therapy were ordered. (*Id.* at 441)

On April 23, 2002, plaintiff presented to the Mental Health Outpatient Clinic ("MHC"), stating that he was "not sleeping and was never treated for PTSD." (*Id.* at 437) Progress notes indicate that plaintiff was not having suicidal or homicidal ideation or hallucinations. His thought process was goal directed and he was alert, polite,

---

[3]Plaintiff has received all of his medical care at the VAMC. (*Id.* at 53)

3

oriented and cooperative during the examination. Plaintiff reported feeling easily agitated and having sleep disruptions (including nightmares) for some time. A PTSD evaluation was scheduled.

On the same day, plaintiff had an appointment with Nurse Gallo, complaining of persistent back pain. (*Id.* at 438) A back x-ray revealed mild degenerative joint disease at L5-S1. (*Id.* at 438, 431) Plaintiff reported that the pain medications he was taking were ineffective. (*Id.* at 438)

Plaintiff returned for an appointment with Nurse Gallo on July 11, 2002 for complaints of back pain, arm numbness, and insomnia. (*Id.* at 435) He was encouraged to seek an evaluation for PTSD. (*Id.* at 436)

On August 2, 2002, plaintiff had an evaluation with a physical therapist. (*Id.* at 433) He tolerated the therapy well and was given back strengthening exercises to do at home. (*Id.* at 434)

During a January 23, 2003 appointment at VMAC, plaintiff complained of chronic lower back pain and frequent migraine headaches. (*Id.* at 430) Plaintiff said that Excedrin helped with headaches. He was referred to physical therapy and provided with back strengthening exercises. (*Id.* at 431)

On July 28, 2003, plaintiff a had follow-up appointment with Nurse Gallo and complained of lower back pain and migraine headaches. (*Id.* at 426) At that time, plaintiff was working for an airline performing a lot of physical labor. (*Id.* at 427) Progress notes reflect that plaintiff was having difficulty coping with PTSD issues. (*Id.* at 429) Nurse Gallo scheduled an appointment with the MHC.

4

On August 12, 2003, plaintiff returned to the MHC, complaining of back pain and nightmares. (*Id.* at 420) Plaintiff relieved the nightmares by consuming excessive amounts of alcohol. Psychotherapy, "given [plaintiff's] significant stressors and history of violent impulses," was recommended. (*Id.* at 423) Plaintiff agreed to schedule therapy after his "alcohol consumption ceased." (*Id.*) His diagnosis was night terrors, PTSD and alcohol dependency.

On September 8, 2003, plaintiff appeared for an appointment at the MHC. (*Id.* at 418-419) He reported having mood swings, "frequent nightmares about combat," and feelings of isolation. Progress notes reveal that plaintiff had some symptoms of PTSD, but was able to tolerate without medication.

On November 6, 2003, plaintiff had a follow-up appointment with Nurse Gallo. (*Id.* at 414) He indicated that he was happy to be working as a park service employee. Plaintiff complained of lower back pain, sleep problems and migraines. (*Id.* at 415) Nurse Gallo requested input from the Psychiatry Department regarding PTSD.

On January 13, 2004, plaintiff was examined by Dr. Gabriel Bucurescu ("Dr. Bucurescu"), a board certified neurologist, for migraine headaches that were occurring 5-6 days a week. (*Id.* at 410) The throbbing pain plaintiff experienced was also accompanied by nausea. Dr. Bucurescu found that plaintiff was able to follow three step commands,

repeat and name appropriately, and had normal writing and reading abilities. (*Id.* at

411) He was prescribed Naproxen,[4] Propranolol[5] and Excedrin. (*Id.* at 413)

Plaintiff returned to Nurse Gallo on March 8, 2004, with complaints of lower back

pain and migraine headaches. (*Id.* at 406) His medications and x-rays were reviewed.

(*Id.* at 407)

On September 13, 2004, plaintiff was assessed a Global Assessment of

Functioning ("GAF[6]") score of 48.[7] (*Id.* at 381) A diagnosis of PTSD was also noted.

Plaintiff returned for follow-up care with Nurse Gallo on September 16, 2004.

(*Id.* at 402) His complaints were lower back pain, migraine headaches, PTSD and

allergies. (*Id.* at 403) Progress notes reveal that plaintiff stopped drinking alcohol in

November 2003.

---

[4]Naproxen is used to treat pain or inflammation. *See* http://www.drugs.com/ naproxen.html (Last visited July 31, 2014).

[5]Among its uses, Propranolol is prescribed to reduce the severity and frequency of migraine headaches. *See* http://www.drugs.com/propranolol.html (Last visited July 30, 2014).

[6]"The GAF scale is a metric used by the American Psychiatric Association to assess an individual's psychological, social and occupational functioning." *Saucedo v. Astrue*, 2011 WL 3651790, at *4 (D. Del. 2011). Under the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), a "GAF score of 21-30 suggests a serious impairment in communication and judgment, or a severe inability to function." *McNatt v. Barnhart,* 464 F. Supp.2d 358, 361 fn.3 (D. Del. 2006). "A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning." *Lee v. Colvin*, 2014 WL 2586935, at *2 fn. 1 (E.D. Pa. 2014).

[7]The details of the appointment do not appear in the record. This GAF score and the diagnosis of PTSD (attributable to Mitchell Gottsagen) are found in Dr. Choi's progress notes dated March 16, 2006.

On November 18, 2004, plaintiff had a follow-up visit with Nurse Gallo. (*Id.* at 402) He complained of the same problems as outlined in the September 16th visit.

Over one year later, on January 23, 2006, plaintiff returned to Nurse Gallo with complaints of severe headaches, chronic back pain, sleep disturbances, and PTSD problems (including flashbacks). (*Id.* at 397) The screening for PTSD was positive. (*Id.* at 398) Plaintiff was referred to the Behavioral Health Laboratory ("BHL").

Plaintiff appeared for an appointment with BHL on January 25, 2006. (*Id.* at 393) Based on the symptoms presented, plaintiff was diagnosed with major depressive disorder, anxiety disorder, and PTSD. (*Id.* at 393-394) With respect to PTSD, plaintiff reported having the following experiences: (1) avoidance of a traumatic event; (2) trouble with recall; (3) loss of interest; (4) feeling detached; (5) feeling numb; (6) trouble sleeping; (7) irritable; (8) difficulty concentrating; and (9) feeling nervous. (*Id.* at 394) An appointment with a mental health care provider was scheduled. (*Id.* at 393)

On February 23, 2006, plaintiff had a follow-up appointment with Nurse Gallo. (*Id.* at 391) His chief complaints were back pain, sleep problems, PTSD, headaches and depression. (*Id.* at 392) Plaintiff's medications were adjusted and appointments with MHC and neurology were recommended.

On March 6, 2006, plaintiff was examined by Dr. Bucurescu for migraine headaches that were occurring approximately three days a week. (*Id.* at 387) The migraines were accompanied by throbbing pain, light and sound sensitivity, and nausea that lasted the entire day. He was prescribed Propranolol, Excedrin and a follow-up appointment was scheduled.

On March 16, 2006, plaintiff was evaluated by board certified psychiatrist Cyndia S. Choi, M.D. ("Dr. Choi"). (*Id.* at 381) Dr. Choi found that plaintiff met the "criteria for PTSD," as he was experiencing nightmares, insomnia, hyper vigilance, and irritability. (*Id.* at 381) Dr. Choi noted that plaintiff wished to avoid medication that was too sedating and was concerned about taking too much time off from work for doctor appointments. His GAF score was 48. (*Id.* at 377)

On May 8, 2006, Dr. Bururescu examined plaintiff for complaints of migraine headaches. (*Id.* at 378) Dr. Bururescu increased plaintiff's dosage of Propranolol, recommended continuation of non-prescription pain medication, and ordered a follow-up appointment.

Later that day, plaintiff was examined by Dr. Choi. The mental status examination revealed that plaintiff was irritable and anxious, his thought processes goal oriented, and his judgment was adequate. (*Id.* at 377) He had no suicidal thoughts or homicidal ideation. Dr. Choi prescribed Celexa[8] and supplied plaintiff with a letter of unemployability. (*Id.* at 377-378)

On June 29, 2006, plaintiff was seen by Nurse Gallo, complaining of frequent migraines, severe back pain and sleep problems related to PTSD. (*Id.* at 374-75) Plaintiff said Celexa improved his mood, but caused drowsiness. Nurse Gallo recommended continued mental health treatment with Dr. Choi.

On June 29, 2006, plaintiff had a follow-up mental health examination with Dr. Choi. (*Id.* at 373-74) Dr. Choi found plaintiff's mood was "dysphoric due to chronic

---

[8]Celexa is used to treat depression. See http://www.drugs.com/celexa.html (Last visited on July 30, 2014).

8

PTSD," his affect was polite and thought processes were "goal directed." There was no psychosis or suicidal or homicidal ideation. Plaintiff reported being concerned about losing his job. Dr. Choi prescribed a Seroquel[9] and discontinued Celexa. (*Id.* at 374) Plaintiff's GAF score was 47.

Plaintiff returned to Dr. Choi on September 8, 2006. (*Id.* at 369) The mental status examination revealed that his: (1) affect was polite and appropriate; (2) thought processes were goal directed; (3) insight and judgment were adequate; and (4) thoughts were not suicidal or homicidal. (*Id.* at 369-70) Dr. Choi observed that plaintiff was having "great difficulty keeping his present job due to his service connected disabilities." (*Id.* at 369) She also noted that he was "despondent due to his situation" but was "coping." (*Id.* at 369-70) Plaintiff's GAF score was 47. (*Id.* at 359)

On the same date, plaintiff was treated by Dr. Bucurescu for migraine headaches. (*Id.* at 370) The mental examination revealed that he was oriented to time, place and person; his judgment was good and he could explain similarities and proverbs well. (*Id.* at 371) Although Propranolol was initially effective, plaintiff's migraines had resumed in intensity and frequency. Dr. Bucurescu discontinued Propranolol and suggested using Excedrin, as needed. A four month follow-up appointment was scheduled. (*Id.* at 373)

On December 21, 2006, plaintiff was treated by Nurse Gallo for left hip pain. (*Id.* at 366-68) He reported taking Motrin daily for relief. Progress notes indicate that his headaches were occurring daily and spontaneously. Motrin and Excedrin relieved the

[9]Seroquel is an anti-psychotic medicine used to treat schizophrenia and major depression. *See* http://www.drugs.com/seroquel.html (Last visited July 31, 2014).

pain, but left plaintiff feeling dizzy. Plaintiff reported having sleep difficulties as well as nightmares. The loss of nighttime sleep made plaintiff tired and unable to work during the day. He admitted having suicidal thoughts. (*Id.* at 368) Plaintiff's physical examination revealed very tense muscles and trigger points, with limited flexion of knees. He was prescribed Naproxen and told to continue Excedrin. A six-week follow-up appointment was scheduled.

On February 1, 2007, plaintiff returned to Nurse Gallo, complaining of headaches and chronic lower back pain. (*Id.* at 363) The migraines would start soon after he awoke at 4:00 or 4:30 a.m. and last for three to four hours. Excedrin would relieve the pain, but left plaintiff feeling hungover.

On February 5, 2007, plaintiff saw Dr. Bucurescu complaining of frequent migraines. (*Id.* at 360) Progress notes reflect that the headaches were without aura and still "occurring rather frequently." (*Id.* at 362) Dr. Bucurescu prescribed Zomig[10] to take at the onset of a migraine.

During a February 7, 2007 appointment, Dr. Choi observed that plaintiff was alert and oriented without psychosis. (*Id.* at 359) His mood was dysphoric, thought content clear, without suicidal or homicidal ideation. Plaintiff expressed concerns with his inability to maintain employment. Dr. Choi provided a letter to support plaintiff's unemployability. His GAF score was 47. (*Id.* at 353)

---

[10]Zomig is used to treat a migraine headache that has already begun. "It will not prevent new headaches or reduce the number of attacks." *See* http://www.drugs.com/ zomig.html (Last visited July 31, 2014).

On March 7, 2007, plaintiff appeared for an appointment with a physical therapist

to address his complaints of increased pain and decreased function. (*Id.* at 357-59)

His pain level was recorded at 7 out of 10 (highest). Instruction on exercises to relieve

pain was provided. Plaintiff was scheduled for a six-week physical therapy plan.

Plaintiff appeared for a follow-up mental health evaluation with Dr. Choi on

March 15, 2007, where he complained of frequent nightmares. (*Id.* at 353) Dr. Choi

noted:

> [Plaintiff] continues to suffer with significant PTSD which interferes with
> his nightly sleep. He has frequent insomnia. He has been unable to
> hold a job due to his PTSD, although he would prefer to work, he has had
> multiple bad experiences due to PTSD . . . .
> [Plaintiff's] [m]ood is depressed . . . [a]ffect is restricted but polite.
> [His] [t]hought processes are goal directed.

(*Id.* at 353) Plaintiff reported using Remeron[11] and Valium,[12] but prefers using a

minimal amount of medication. His GAF score was 47. (*Id.* at 346)

On March 15, 2007, plaintiff was examined by Nurse Gallo for complaints of

back pain. (*Id.* at 356) She noted that his depression remained the same with suicidal

thought, but no intent. (*Id.*) Plaintiff was instructed to continue physical therapy and

treatment with mental health services.

Plaintiff returned to Dr. Choi on May 7, 2007. (*Id.* at 346) Plaintiff was having

frequent nightmares and difficulty dealing with the stresses associated with

reorganizing his life following the loss of his job. The mental status examination

---

[11]Remeron is "used to treat major depressive disorder." *See* http://www.drugs.
com/remeron.html (Last visited July 31, 2014).

[12]Valium is "used to treat anxiety disorders, alcohol withdrawal symptoms or
muscle spasms." *See* http://www.drugs.com/valium.html (Last visited July 31, 2014).

revealed plaintiff's mood was depressed and affect "somewhat more restricted." (*Id.* at

347) Dr. Choi discussed and reviewed his current medications. (*Id.* at 551) He had

stopped taking Remeron because it was too sedating. He reported taking Valium

rarely. His GAF score was 47. (*Id.* at 548)

On May 7, 2007, plaintiff was examined by Dr. Bucurescu for complaints of

migraine headaches, which were occurring about five times a week. (*Id.* at 347-348)

Progress notes indicate that Excedrin and Zomig helped relieve the headaches. (*Id.* at

350)

On August 23, 2007, plaintiff presented to Nurse Gallo, complaining of persistent

headaches. (*Id.* at 471) Progress notes state that he remained depressed with suicidal

thought, but no intent. (*Id.* at 472)

In a letter dated September 26, 2007,[13] Dr. Choi wrote :

Plaintiff is under my care at the Philadelphia VA Medical Center Mental
Health Clinic for his service connected diagnosis of Post Traumatic
Stress Disorder. He is presently a total of 70% or more and he is
totally disabled and unemployable due to his PTSD. He has not
worked since 2006, due to his PTSD which interferes with his ability
to concentrate and follow tasks. Also, due to his PTSD, he is socially
isolative, irritable, impulsive, with poor social skills that interferes with
his ability to maintain employment and work with others.

(*Id.* at 455)

Plaintiff returned for a mental health appointment on September 27, 2007. (*Id.* at

548) Dr. Choi observed:

[Plaintiff] continues to suffer with significant PTSD which interferes with his
nightly sleep. He has frequent nightmares. He has been unable to hold
a job due to PTSD, although he would prefer to work. He had gotten

---

[13]The letter is addressed "To whom is may concern." (*Id.* at 455)

a job as a diesel engine mechanic but he could not do it due to PTSD. He then went and received training for pharmacy tech but he could not do that either due to PTSD and physical injuries.

(*Id.* at 549)

The mental status examination revealed that his mood was depressed and affect more restricted. Plaintiff's thought process was goal directed with no delusions or suicidal/homicidal ideation. Plaintiff's insight and judgment were deemed "adequate." Progress notes state that Dr. Choi adjusted plaintiff's medications and scheduled a follow-up appointment. (*Id.* at 551) His GAF score was 47. (*Id.* at 634)

During a November 30, 2007 appointment, Dr. Choi found plaintiff's mood depressed, affect restricted and thought processes contained "ruminations about past trauma." (*Id.* at 634) Progress notes reflect that plaintiff "admits to suicidal ideation periodically, but denies attempts or present intentions." (*Id.*) There was no finding of homicidal ideation or delusions. His insight and judgment were "poor." (*Id.*) Dr. Choi continued his course of medications, including a prescription for Diazepam.[14] (*Id.* at 634-36)

On the same date, Dr. Choi completed a Psychiatric/Psychological Impairment Questionnaire ("questionnaire"). (*Id.* at 501-16) Plaintiff's current GAF was listed at 41. (*Id.* at 501) Dr. Choi diagnosed "PTSD due to the Persian Gulf War" and concluded that his prognosis was "poor." (*Id.* at 501) She identified the following clinical findings[15]

---

[14]The generic name for Valium. *See* http://www.drugs.com/valium.html (Last visited on July 31, 2014).

[15]In the Multiple Impairment Questionnaire, Dr. Choi opined that plaintiff has "significant depression and anxiety due to PTSD which interfere with ability to sustain work, despite his attempts." (*Id.* at 509)

13

to support her diagnosis of PTSD: (1) poor memory; (2) appetite disturbance with weight change; (3) sleep disturbance; (4) mood disturbance; (5) emotional lability; (6) recurrent panic attacks; (7) anhedonia or pervasive loss of interest; (8) paranoia or inappropriate suspiciousness; (9) feelings of guilt/worthlessness; (10) difficulty thinking or concentrating; (11) suicidal ideation or attempts; (12) social withdrawal or isolation; (13) decreased energy; (14) intrusive recollections of a traumatic experience; (15) generalized persistent anxiety; and (16) hostility and irritability. (*Id.* at 502)

Dr. Choi listed the following laboratory and diagnostic test results to support her prognosis: "mental status exam-depressed mood, restricted affect, thought process ruminations about traumatic experience." (*Id.* at 502-503) In response to a series of prompts regarding plaintiff's ability to sustain an activity during a normal workday, Dr. Choi concluded that plaintiff was "markedly limited" in the following categories: (1) understanding and memory;[16] (2) sustained concentration and persistence;[17] (3) social interactions;[18] and (4) adaption.[19] Dr. Choi added that plaintiff was unable to maintain concentration and became socially withdrawn and irritable. (*Id.* at 506) She averred

---

[16] Of the three activities listed in this category, plaintiff was "markedly limited" in two and "moderately limited" in one. (*Id.* at 504)

[17] Of the eight activities listed in this category, plaintiff was "markedly limited" in six and "moderately limited" in two. (*Id.* at 504-505)

[18] Of the five activities listed in this category, plaintiff was "markedly limited" in four and "moderately limited" in two. This discrepancy is due to Dr. Choi concluding that plaintiff had different levels of limitation with respect to activities described in a compound question. (*Id.* at 505)

[19] Of the four activities listed in this category, plaintiff was "markedly limited" in three and "moderately limited" in one. (*Id.* at 505-506)

14

that plaintiff was unable to tolerate even low work stress because "he still has difficulties with PTSD without the stress of work." (*Id.* at 507)

Plaintiff returned to Dr. Choi for treatment on December 31, 2007. (*Id.* at 626) The mental status examination revealed his mood as chronic dysphoric and affect restricted. Plaintiff had no suicidal or homicidal ideation and his insight and judgment were adequate. (*Id.* at 627) Dr. Choi assessment was PTSD, chronic and severe, related to plaintiff's service in the Gulf War and a motor vehicle accident. (*Id.* at 628) Plaintiff reported that Remeron helped with insomnia, but caused grogginess. Plaintiff also reported taking Valium, but had not had a refill since September 2007. (*Id.* at 628) Plaintiff's GAF was 45. (*Id.* at 522)

On February 11, 2008, plaintiff was treated by Nurse Gallo for complaints of lower back pain and migraine headaches. (*Id.* at 524) He reported that his left hip pain improved because he had stopped walking distances.

At his March 10, 2008 appointment with Dr. Choi, plaintiff complained that his nightmares were becoming worse. (*Id.* at 520) Dr. Choi assessed plaintiff's mood as depressed and affect appropriate. (*Id.* at 616) Plaintiff had no signs of suicidal or homicidal ideation and his judgment and insights were fair. Dr. Choi prescribed Celexa and scheduled a follow-up appointment. (*Id.* at 520)

On April 17, 2008, plaintiff returned to Dr. Choi, complaining of insomnia. (*Id.* at 613) The mental status examination revealed that plaintiff was depressed, affect restricted and thought processes were goal directed. He had no present suicidal or homicidal ideation, but had feelings of hopelessness and helplessness. (*Id.* at 613) Dr.

Choi continued plaintiff's medications and scheduled a three-month follow-up appointment. (*Id.* at 615)

Plaintiff was treated by Dr. Burcurescu for migraines on June 17, 2008. (*Id.* at 603) Progress notes reflect that the headaches were occurring daily. The mental status examination revealed that plaintiff was able to: (1) follow three step commands; (2) explain proverbs well; (3) explain similarities correctly; and (4) exercise good judgment. (*Id.* at 604) Dr. Bucurescu adjusted his prescriptions and ordered a six month follow-up appointment. (*Id.* at 606)

On July 21, 2008, State Agency Psychologist C. Tucker, Ph.D. ("Dr. Tucker"), completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. (*Id.* at 558) Dr. Tucker diagnosed depression and PTSD. (*Id.* at 561-562) She found that plaintiff was "not very credible" and had "compliance problems with his medications and with his exercises for his physical problems." (*Id.* at 571) Dr. Tucker also surmised that plaintiff's claims of isolation were overstated since he was able to take care of his girlfriends' children, drive them to school, shop, attend appointments and had a relationship. (Id.) She concluded that plaintiff was able to handle low stress tasks.

On July 24, 2008, plaintiff presented with complaints of migraines, wrist pain, hip pain and depression. (*Id.* at 595) He reported having fewer nightmares and sleeping better. (*Id.* at 596) Nurse Gallo noted that plaintiff was suicidal, without intent. (*Id.* at 596)

16

Progress notes reflect that plaintiff contacted Nurse Gallo on July 25, 2008, complaining of persistent pain. (*Id.* at 615) The complaints were relayed to Dr. Choi, who indicated the concerns would be addressed at his next scheduled appointment (approximately two weeks later).

During an August 6, 2008, appointment with Dr. Choi, plaintiff reported hip and wrist pain. (*Id.* at 589) Dr. Choi concluded that plaintiff's pain was not related to depression or PTSD. The mental status examination revealed that plaintiff was depressed, affect restricted and no suicidal or homicidal ideation. (*Id.* at 591) Dr. Choi recommended an examination by a rheumatologist.

Plaintiff returned to Dr. Choi on November 6, 2008 complaining that he "felt like crap." (*Id.* at 706) Progress notes reflect that plaintiff was depressed "over his finances due to his unemployability." (*Id.*) Dr. Choi diagnosed "PTSD with increasing depression due to stressors." (*Id.* at 708) Plaintiff's affect was appropriate, his thought processes were goal oriented, and he did not have suicidal or homicidal ideation. (*Id.* at 706) His GAF score was 45. (*Id.* at 684)

On January 13, 2009, plaintiff returned to Dr. Bucurescu with complaints of migraine headaches. (*Id.* at 703) Dr. Bucurescu adjusted his medications. (*Id.* at 705)

On January 14, 2009, plaintiff presented to Nurse Gallo with complaints of migraine headaches that were occurring more frequently and with intensity. (*Id.* at 701) He complained of ongoing hip and back pain, which improved with stretching exercises. Plaintiff also reported having trouble sleeping and snoring. Nurse Gallo referred plaintiff to the sleep clinic to "eliminate [the] component [of] sleep apnea." (*Id.* at 702)

17

On February 9, 2009, plaintiff returned to Dr. Choi for a follow-up appointment. (*Id.* at 683) The mental status examination revealed that he was depressed and anxious, but was coping. Plaintiff's affect was restricted, thought processes were goal directed, and there was no presence of suicidal or homicidal ideation. (*Id.* at 684)

On March 11, 2009, plaintiff was evaluated by the Polytrauma Team ("the Team"). (*Id.* at 660-668) Plaintiff complained of: (1) headaches; (2) backaches; (3) poor sleep; (4) weakness in his legs; (5) difficult getting dressed; (6) coughing and choking while eating; (7) constipation; (8) frequent urination; and (9) depression. (*Id.* at 663) Progress notes reveal that plaintiff stated "I should be able to go to work and do things. This is not what I planned." (*Id.*) The Team concluded that plaintiff would benefit from participation because he suffered from "significant PTSD," headaches, pain from multiple sources, did not take medications as prescribed, and had poor nutritional habits. (*Id.* at 665)

On March 20, 2009, plaintiff was treated for headache pain by an acupuncture provider. (*Id.* at 656) The acupuncture treatment was helpful, allowing him to do some housework and stretching exercises. Progress notes state that plaintiff was concerned about his finances and continued to reject ideas about taking jobs that would be "more in keeping with his physical issues." (*Id.*)

On April 13, 2009, plaintiff was seen by Dr. Bucurescu for persistent migraine headaches. (*Id.* at 832) Although Maxalt[20] was helping, plaintiff continued to have

---

[20]Maxalt is used to treat migraine headaches that have already started. "It will not prevent headaches or reduce the number of attacks." *See* http://www.drugs.com/maxalt.html (Last visited July 30, 2014).

18

headaches about four times per week. Dr. Bucurescu adjusted the medications. (*Id.* at 835)

On May 11, 2009, Dr. Choi contacted plaintiff by telephone to discuss the rescheduling of his May 15, 2009 appointment. (*Id.* at 824) She concluded he was "psychiatrically stable on present [prescriptions] of Valium, Ambien,[21] which he takes seldomly. [His] last refill was in February. . . he stopped most medications for a while because he was feeling sick and . . . that he was on an excessive amount of medication." (*Id.* at 824) His GAF score was 45. (*Id.* at 810)

Dr. Choi examined plaintiff on May 20, 2009. (*Id.* at 810) Plaintiff complained of depression and asked to try antidepressant medication. (*Id.* at 811) The mental status examination revealed: depression, restricted affect and thought processes without suicidal or homicidal ideation. His insight and judgment were adequate. He reported increased depression, irritability, anxiety, increased thoughts of suicide and insomnia. (*Id.* at 811, 814) Dr. Choi prescribed Celexa.[22] (*Id.* at 813) Progress notes also reveal that plaintiff was depressed over finances due to his unemployability. (Id. at 811)

In a May 20, 2009 letter,[23] Dr. Choi noted:

> Plaintiff suffers from posttraumatic stress disorder secondary to his involvement in the Persian Gulf War. His prognosis is poor. He suffers from poor memory, sleep disturbance, mood disturbances, emotional lability, recurrent panic attacks, anhedonia/pervasive loss of interests,

_____

[21]Ambien is used to treat insomnia. *See* http://www.drugs.com/ambien.html (Last visited on July 30, 2014)

[22]Celexa "is used to treat depression." *See* http://www.drugs.com/celexa.html (Last visited on July 31, 2014).

[23]The letter is addressed "To Whom It May Concern." (*Id.* at 713)

19

paranoia/inappropriate suspiciousness, difficulty thinking/concentrating, suicidal ideation, social withdrawal/isolation, decreased energy, intrusive recollections of a traumatic experience, generalized persistent anxiety, hostility, irritability and nightmares which often involve his traumatic past . . . .

Plaintiff is markedly limited in his capacity to remember locations and work-like procedures; understand and remember detailed instructions, carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; and sustain ordinary routine without supervision. . . . Plaintiff is essentially precluded from accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes . . . . Plaintiff experiences episodes of deterioration/decompensation in work/work-like settings which cause him to withdraw from the situation and/or experience an exacerbation of signs and symptoms. . . . Plaintiff is incapable of tolerating even low work stress as work stress can trigger irritability or social withdrawal. . . . If plaintiff were to attempt to return to work, I would expect him to be absent at least three days a month secondary to his impairment and treatment. . . .

(*Id.* at 713-14)

Plaintiff returned to Dr. Bururescu on August 24, 2009 with complaints of

migraine headaches that were no longer responding to medication. (*Id.* at 793, 794,

796) The headaches occurred about four days a week. (*Id.* at 793) The mental status

examination revealed that plaintiff "could explain proverbs well" . . . "could do

similarities correctly" and had "good" judgment. (*Id.* at 794)

On September 18, 2009, plaintiff was seen by Dr. Choi, complaining of

persistent depression, severe pain, insomnia, and inability to concentrate or complete

tasks. (*Id.* at 787) The mental status examination revealed his mood as depressed,

and his affect restricted with no presence of suicidal or homicidal ideation. Dr. Choi

20

reviewed and adjusted his Celexa and Valium prescriptions. (Id. at 789) His GAF was a 45. (Id. at 870)

Plaintiff returned to Dr. Choi for an appointment on December 18, 2009. (Id. at 870) He complained of chronic pain and feelings of hopelessness. Progress notes reflect that plaintiff had relapsed with alcohol use, was depressed and angry. The mental status examination revealed that plaintiff was depressed and his affect restricted. His thought content was "passive suicidal, but with no intention or plan." (Id.) Plaintiff's insight and judgment were fair and his thought processes were goal-oriented. Dr. Choi directed plaintiff to continue taking Celexa for depression. (Id. at 872)

On the same date, Dr. Choi completed a new questionnaire. (Id. at 839) His current GAF was listed at 42. In this questionnaire, Dr. Choi added "persistent irrational fears" and removed "paranoia or inappropriate suspiciousness" from the clinical findings listed to support her diagnosis. (Id. at 840) With respect to "the ability to make simple work related decisions" and "the ability to travel to unfamiliar places or use public transportation," Dr. Choi changed the responses to "markedly limited."[24] (Id. at 843-844) Regarding the question about episodes of deterioration in work, Dr. Choi changed her explanation to "[plaintiff] cannot tolerate any stress. [He] [b]ecomes more withdrawn . . . ." (Id. at 844) With respect to tolerating work stress, Dr. Choi averred "[plaintiff] has poor judgment with poor social interactions. He [c]annot control [his] emotions, [has] no energy to work, [and] no tolerance for stress." (Id. at 845)

_____

[24]There was also no distinction made with respect to two activities listed in social interactions, rated as moderately limited. (Id. at 843)

Plaintiff presented to Nurse Gallo on February 8, 2010, with continued complaints of back pain. (*Id.* at 866) Progress notes reflect that he was doing "alright," had headaches three days a week, was depressed, and had sleep problems. (*Id.* at 868) He reported drinking alcohol frequently. (*Id.* at 867)

On July 7, 2010, plaintiff appeared for a mental status evaluation by Dr. Frederick Kozma, Ph.D., as part of his application for disability determination services. (*Id.* at 847-855) Plaintiff drove himself to the appointment without difficulty. (*Id.* at 847) During the clinical interview, Dr. Kozma observed that plaintiff maintained good eye contact during the examination, but had difficulty organizing his thoughts. (*Id.* at 849, 853) On the mini-mental status examination, plaintiff was able to repeat and recall words, perform serial tasks, name common objects, follow three-step commands, read and follow written directives, write a sentence correctly, and copy a diagram of intersecting pentagons. Dr. Kozma found this was normal cognitive functioning. (*Id.* at 850) He assessed plaintiff's GAF at 45.

In response to questions regarding ability to do work-related (mental) activities, Dr. Kozma concluded that plaintiff was markedly impaired in: (1) his ability to make judgments in simple work-related decisions; (2) understanding and remembering complex instructions; (3) carrying out complex instructions; and (4) his ability to make judgments in complex work-related decisions. (*Id.* at 852) Dr. Kozma found that plaintiff had no impairment in understanding and remembering simple instructions. Dr. Kozma found plaintiff was "mildly impaired" in the ability to interact with the public, co-workers and supervisors. (*Id.* at 853) He determined that plaintiff's impairment would

have a "moderately severe" affect on his ability to sustain work and attendance in a

normal work-setting. (*Id.* at 855)

In summation, Dr. Kozma opined:

Plaintiff suffers from major depressive disorder characterized by sad
affect, feelings of helplessness, low motivation, a loss of pleasure in
most activities, difficulties with attention and concentration. He has
experienced suicidal ideation in the past.
Plaintiff suffers from breathing related sleep disorder manifested by
insomnia related to sleep apnea.
Plaintiff does not appear able to manage his own funds.

(*Id.* at 850-851)

On August 30, 2010, plaintiff returned to Nurse Gallo with complaints of back

pain and chest pain at night. (*Id.* at 932) Although plaintiff reported taking Celexa,

there were no recent prescription orders on file. Nurse Gallo found his affect as slightly

brighter and advised him to continue treatment with Dr. Choi. (*Id.* at 932)

On October 7, 2010, members of the Team met to discuss plaintiff's case. (*Id.* at

942-43) They concluded that their services were no longer needed because he had not

been in contact with nor responded to their outreach attempts. (*Id.* at 943) Plaintiff's

case was returned to his primary care provider, Nurse Gallo, with the option of returning

to the Team as needed. (Id. at 943)

Plaintiff had a follow-up appointment with Nurse Gallo on November 22, 2010,

complaining primarily of lower back pain. (*Id.* at 940) His back pain improved with

inactivity. The physical examination revealed that his affect was slightly brighter.

Plaintiff reported experiencing anxiety, accompanied with diarrhea, before leaving the

house. He denied taking any medication for depression or PTSD. (*Id.* at 940-41)

On March 14, 2011, Dr. Choi completed a third questionnaire. (*Id.* at 956) Plaintiff's GAF was 45. Although similar to the first and second questionnaires, Dr. Choi noted the presence of the following, to support her clinical findings: (1) delusion or hallucinations; (2) paranoia or inappropriate suspiciousness; (3) perceptual disturbances; and (4) blunt, flat or inappropriate affect. (*Id.* at 957) She removed the "persistent irrational fears" from the listing. Dr. Choi increased her assessments from "moderately limited" to "markedly limited" with respect to: (1) ability to ask simple questions or request assistance; and (2) the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.* at 960) Conversely, she found that plaintiff's ability to make simple work related decisions improved from "markedly limited" to "moderately limited." Dr. Choi also noted that plaintiff had "poor concentration," which limited his ability to perform basic work related activities. (*Id.* at 961) Dr. Choi added that "[d]ue to depression, poor concentration, irritability, poor impulse control, [plaintiff] is totally disabled." (*Id.* at 962)

## C. Administrative Hearing

### 1. Plaintiff's testimony

Plaintiff was born on May 8, 1979. (*Id.* at 33) He completed high school and obtained a vocational degree in pharmaceuticals. He is unmarried and lives with his fiancé and her daughter. (*Id.* at 38)

Plaintiff served in the United States Army from 1989 to 1993. (*Id.* at 48) He was a diesel engine mechanic. He was stationed overseas in 1990-1991, during the Gulf War. (*Id.* at 50) He was "partially" in combat, stationed "above the front lines." Plaintiff

24

declined to describe what occurred, explaining that he did not wish to relive the wartime experiences. (*Id.*) Plaintiff was diagnosed with PTSD and depression in 1992 or 1993. (*Id.* at 69)

In two separate slip and fall accidents in 1990 and 1992, plaintiff sustained head injuries and was hospitalized for one day at a military hospital. In 1993, while on military leave, plaintiff was a passenger in a car that was rear-ended by a tractor trailer. (*Id.* at 48-49, 67) He suffered a head injury and whiplash. (*Id.* at 49)

Following his discharge from the Army, plaintiff worked as a custodian, park service worker, an airline baggage handler, an exercise equipment repair/maintenance person, a construction worker, and a dialysis technician. (*Id.* at 53-54, 64-65)

Plaintiff's last job was at a landfill where his duties included carrying and installing pipes on top of garbage. (*Id.* at 64) In 2006, he stopped working, no longer able to perform the physical demands due to wrist pain, back pain, migraine headaches and high blood pressure. (*Id.* at 33-34) He tried physical therapy, a TENS unit and medication to relieve symptoms. (*Id.* at 35)

Plaintiff experiences back pain on a daily basis. (*Id.* at 36) The pain radiates down his legs if he walks too much. (*Id.* at 47) Plaintiff also has pain in both wrists and wears splints to relieve the pain. He had surgery on his left wrist in 1992. He suffers from migraine headaches approximately five days a week and finds relief with Excedrin. (*Id.* at 45-46)

He has been treated for PTSD since March 2006. Plaintiff has nightmares twice a week due to PTSD. (*Id.* at 38) He also suffers with anxiety before leaving the house

25

and, as a result, has to use the bathroom. Plaintiff sleeps about four hours a night due to anxiety. (*Id.* at 42) Although diagnosed with sleep apnea in 2009, his anxiety has prevented him from participating in an overnight sleep study. (*Id.*) Plaintiff takes naps, almost daily. (*Id.* at 43)

He takes pain medicine, but experiences side effects of dizziness and constipation. (*Id.* at 44) He last took medication for depression in October 2010. (*Id.* at 43) He testified that he did not notice any improvement in his mood with medication. Depression medication also causes side effects of dizziness, nausea and chest pains. (*Id.* at 45)

Plaintiff can walk for approximately 10-15 minutes before having to stop due to pain. (*Id.* at 36, 51) After five minutes of resting, he can resume walking. (*Id.*) Plaintiff can sit for two hours continuously and stand in one position for approximately one hour. (*Id.* at 47) Plaintiff is able to lift between 15 - 20 pounds. (*Id.* at 51) He is unable to carry buckets of water or lift groceries. (*Id.* at 37) Plaintiff does not shop for groceries. (*Id.* at 50) His fiancé does the laundry and cooking. (*Id.* at 41)

Plaintiff testified that it takes three hours to get ready to leave in the morning. (*Id.* at 39) He dresses himself and can review directions. (*Id.*) Plaintiff has memory trouble and problems with concentration. (*Id.* at 43) He gets along with people, although has experienced anger outbursts in previous jobs. (*Id.* at 39) While he does not have any friends, plaintiff is able to interact with his family at dinner or at a game. He spends a lot of time watching television and often feels depressed. (*Id.* at 40) Plaintiff prefers to be left alone and has thoughts of hurting himself. He does not have

any social activities. (*Id.* at 39-40) He attended a church service in January 2011. (*Id.*

at 39, 52)

## 2. VE's testimony

Following plaintiff's testimony, the ALJ consulted VE Mitchell A. Schmidt. (*Id.* at

53) The ALJ posed the following hypothetical question:

> I'd like for you, if you would, to assume a person's who's 36 years of age
> on his onset date; has a 12[th] grade education plus a degree in pharmaceuticals;
> past relevant work as indicated; right handed by nature; suffering from
> various impairments, including degenerative disc disease as a result of a fall
> and motor vehicle accident, some depression and probably some PTSD. He
> indicates in his testimony that he has sleep apnea, has some high blood
> pressure that's fairly well controlled by medication. All of these things do
> cause him to have some moderate depression, pain, and discomfort, and
> radiation of that pain on an infrequent basis; occasional headache; and
> infrequent flashbacks, somewhat relieved by his medications, however,
> without significant side effects, but he indicates dizziness from one or a
> combination of his meds. As a result, Mr. Schmidt, he would need to have
> simple, routine, unskilled jobs, probably SVP 2 in nature, and you can explain
> what that means. Low concentration, low memory level jobs. By that, I
> mean jobs that have no decision-making requirements, and no changes
> in the work setting, very little judgment required for the job. There's no
> production rate-pace work, and jobs that would have little interaction with
> the public, coworkers, or supervisors. He also seems to have some
> moderate deficiency in his ability to perform his ADL's and to interact
> socially; and to maintain his concentration, persistence, and pace. If I
> find that he can lift 10 pounds frequently, 20 on occasion; can sit for
> two hours, stand for an hour consistently on an alternate basis, however,
> eight hours a day/five days a week; would have to avoid heights and
> hazardous machinery due to his dizziness, stair-climbing, temperature
> and humidity extremes. Due to his hands, no fine manipulation or dexterity.
> Due to his headaches on occasion, no bright lights. With those limitations,
> he would seem to be able to do some light and sedentary work activities.
> Can you give me jobs that exist out there in the national economy in
> significant numbers and with those limitations as a vocational expert?

(*Id.* at 54-56) The VE answered affirmatively and concluded that plaintiff could perform

jobs that are quantified with specific vocational preparations at levels one or two, e.g.,

unskilled occupations.[25]  (*Id.* at 57) The VE testified that plaintiff could not perform his

past work. (*Id.* at 57)

### 3. The ALJ's Findings

The ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social
Security Act on December 31, 2010.

2. The claimant did not engage in substantial gainful activity during the
period from his alleged onset date of October 15, 2006 through his date last
insured of December 31, 2010 (20 C.F.R. 404.1571 et seq.).

3. Through the date last insured, the claimant had the following
severe impairments: Degenerative disc disease, wrist pain, depression and
posttraumatic stress disorder ("PTSD")((20 C.F.R. 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment
or combination of impairments that met or medically equaled one of the
listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R.
404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds
that, through the date last insured, the claimant had the residual functional
capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and was
further limited to simple, unskilled jobs which were SVP 2 in nature, low
concentration and low memory, defined as no decision making requirements
or changes in the work setting, and very little judgment required, no production
or rate-paced work, little interaction with the public, coworkers, or supervisors,
but was able to lift 10 pounds frequently and 20 pounds occasionally, sit for two
hours, stand for one hour, consistently, on an alternate basis, eight hours per
day, five days a week, had to avoid heights, hazardous machinery, and stair
climbing due to dizziness, temperature or humidity extremes, as such exposure
would likely aggravate his symptoms, no fine manipulation or dexterity, and no
bright lights due to headaches.

6. Through the date last insured, the claimant was unable to perform any past
relevant work (20 C.F.R. 404.1565).

_____

[25]The VE concluded that plaintiff could perform the occupations of garment
sorter, folder, surveillance systems manager and stuffer. (*Id.* at 56-57)

7.  The claimant was born on May 8, 1970 and was 40 years old, which is defined as a younger individual age 18-49, on the date last insured 20 C.F.R. 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from October 15, 2006, the alleged onset date, through December 31, 2010, the date last insured (20 C.F.R. 404.1520(g)).

(*Id.* at 13-24)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are

conclusive if they are supported by substantial evidence.  Accordingly, judicial review of

the ALJ's decision is limited to determining whether "substantial evidence" supports the

decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In

making this determination, a reviewing court may not undertake a de novo review of the

ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words,

even if the reviewing court would have decided the case differently, the ALJ's decision

must be affirmed if it is supported by substantial evidence. *See id.* at 1190–91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–51, (1986) (internal citations omitted). Thus, in the context of judicial review under §
405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)). Where, for

example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir.1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner's] decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner's] decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1

(1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform her past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262–63 (3d Cir.2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. Arguments on Appeal

On appeal, plaintiff contends that the ALJ's decision is not supported by substantial evidence because he did not properly weigh the medical opinion of treating physician, Dr. Choi. (D.I. 11) Defendant counters that there is substantial record

32

evidence to support the ALJ's conclusion that Dr. Choi's opinions did not merit controlling weight. (D.I. 14)

It is well-settled that a treating physician's opinion on issues not reserved for the commissioner must be deemed "controlling" if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). An ALJ may only outrightly reject a treating physician's assessment based on contradictory medical evidence, not due to his or her own credibility judgments, speculation or lay opinion. *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000).

The ALJ must review all of the pertinent medical evidence and "explain" his "conciliations and rejections." *Burnett v. Commissioner of Social Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000). Without such information, a reviewing court is unable to determine if probative evidence was not credited or simply ignored. *Id.* at 119; *see* Fargnoli, 247 F.3d 34 at 41 (quoting *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir.1981)). If a reviewing court is denied this opportunity, the claim must be remanded or reversed and all evidence must be addressed. *See Adorno v. Shalala,* 40 F.3d 43 (3d Cir.1994).

Applying this authority to the record at bar, the court finds that the ALJ did not adequately evaluate the opinion evidence offered by plaintiff's treating physician, Dr. Choi. The administrative record is over 900 pages and chronicles plaintiff's treatment at VMAC from December 1998 to 2011. (D.I. 8) From 2006 to 2010, plaintiff had at least

19 appointments with Dr. Choi.[26]  Her progress notes reveal detailed information about plaintiff, including his mental health history, current complaints, examination results, diagnosis, drug history and intake, prognosis and GAF assessment.  The progress notes of Nurse Gallo,[27] and to a lesser degree Dr. Bucurescu, include similar information.  Similarly, following a mental status examination, Dr. Kozma found that plaintiff had a generally sad and sullen appearance, a depressed affect, sleep problems, feelings of helplessness, decreased memory and concentration, and limited insight and judgments.  Dr. Kozma assessed plaintiff a GAF score of 45, the same score given by Dr. Choi in March 2011.

Nonetheless, the ALJ determined that Dr. Choi's opinion did not merit controlling weight because "it was not well supported by medical signs and laboratory findings and is inconsistent with the detailed treatment records from the VAMC as summarized above."[28] (Id. at 21) The ALJ supported this conclusory determination by referencing discrepancies.  First, he compares Dr. Choi's September 30, 2007 questionnaire and letter dated May 20, 2009 which list numerous symptoms,[29] with the fact that plaintiff

_____

[26]Treatment was also rendered at the MHC and by the Team.

[27]From 2002 to 2011, Nurse Gallo treated plaintiff at least 22 times.

[28]In so doing, the ALJ did not rely on any contrary medical opinion offered by a psychiatrist.  The ALJ accepted some of Dr. Kozma's findings that supported the RFC he found for plaintiff.  However, the ALJ specifically rejected Dr. Kozma's conclusions about plaintiff's marked limitations (which supported Dr. Choi's opinions) because they were based plaintiff's "subjective allegations." (Id. at 22)

[29]"[D]epressed mood and a restricted affect with ruminations in thought process, insomnia, intrusive memories, irritability, hypervigilance, excessive startle, avoidance of crows, suicidal thoughts and poor concentration and memory as well as poor social skills." (Id. at 21)

34

has never been hospitalized or received emergency room treatment for those same symptoms. (*Id.*) Although the ALJ implicitly suggests that the absence of hospitalization or emergency care impugns Dr. Choi's opinions, there is no medical opinion or evidence to support this supposition. Instead, the ALJ has impermissibly substituted his own lay opinion to support his rejection of Dr. Choi's opinion. *See Biller v. Acting Commissioner of Social Sec.*, 962 F. Supp. 2d 761, 779 (W.D. Pa. 2013).

Next, the ALJ cites treatment records dated November 6, 2008 and February 9, 2009 to show that Dr. Choi made only two clinical findings, depressed mood and occasional restricted affect.[30] The record, however, reflects other findings, including a diagnosis of PTSD.[31] An ALJ cannot extrapolate pieces of information from the record evidence to support his conclusion while ignoring other evidence that negates the probative value of the evidence cited. *Morales v. Apfel*, 225 F.3d at 318.

Likewise, the ALJ points to an inconsistency regarding medication side effects found in Dr. Choi's narrative (side effects of sedation and poor concentration listed) and progress notes (no side effects listed). A review of progress notes, however, reveals that during a December 31, 2007 examination, Dr. Choi recorded plaintiff's statement about side effects, to wit, Remeron helped with insomnia but made him "overly groggy the next day." (*Id.* at 628) Further, progress notes from March 16, 2006, reflect plaintiff's wish to avoid medication that was too sedating. (*Id.* at 377)

---

[30]Although the ALJ references four instances from the administrative record, the court was able to match only two with treatment rendered by Dr. Choi.

[31]Dr. Choi diagnosed PTSD on the following dates: March 16, 2006, June 29, 2006, March 15, 2007, September 27, 2007, November 30, 2007, December 31, 2007, August 6, 2008 and November 6, 2008.

Similarly, the ALJ observes that on September 18, 2009, plaintiff told Dr. Choi that he was feeling better. The record, however, reflects that plaintiff's mood and sentiments varied, to wit: (1) on September 8, 2006 (despondent); (2) on February 7, 2007 (dysphoric); (3) on November 30, 2007 (had ruminations about past trauma); and (4) on November 6, 2008 (plaintiff said that he "felt like crap").

The ALJ concludes with, "[m]oreover, Dr. Choi's opinion is not supported by the medical evidence or consistent with the record as a whole, including the conservative nature of his treatment and level of care, as well as [plaintiff's] self-reported daily activities." (*Id.* at 21) This broad rejection of Dr. Choi's opinion (unaccompanied by citations to the record) does not afford the court the opportunity to consider whether the ALJ considered all probative evidence.[32]

Relatedly, the record reflects that the ALJ failed to weigh Dr. Choi's findings under the factors provided in 20 C.F.R. § 404.1527 and § 416.927. Where an ALJ finds that a treating physician's opinion does not merit controlling weight, the ALJ must perform a specific analysis to determine how much weight to afford the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). To that end, the ALJ must consider the treatment relationship, the length of the treatment relationship, the frequency of

---

[32]Similarly, the following statement is found in the jurisdiction and procedural history section of the ALJ's opinion:

> The detailed discussion of the prior documentary and testimonial evidence, issues, law and regulations as set forth in the decision dated August 3, 2009 is hereby incorporated into this decision by reference, except to the extent that it is modified herein, and any inferences, findings or conclusions on the ultimate issue of disability are specifically not adopted.

(*Id.* at 11) At best, this catchall statement is ambiguous. At worst, it suggests that the court consider, in tandem, the ALJ's decisions of August 3, 2009 and February 4, 2011, in order to extrapolate a congruent decision.

examinations, the nature and extent of the treatment relationship, supportability of the opinion offered by the medical evidence, consistency of the opinion with the record as a whole, and the specialization of the treating physician. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If, on remand, the ALJ finds that Dr. Choi's opinion does not merit controlling weight, then the ALJ's decision must specifically analyze and explain how much weight to afford the opinion.[33]

## V. CONCLUSION

For the reasons discussed above, the court remands the case for further proceedings consistent with this memorandum opinion. Plaintiff's motion for summary judgment, therefore, is granted and defendant's motion for summary judgment is denied. An appropriate order shall issue.

---

[33]In light of these findings, the court has not considered plaintiff's second ground for appeal (whether the ALJ erred in assessing plaintiff's credibility).